**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

METRO LIGHTS, L.L.C., a New
York limited liability company,
            *Plaintiff-Appellee,*

            v.

CITY OF LOS ANGELES, a California
municipal corporation,
            *Defendant-Appellant.*

No. 07-55179

D.C. No.
CV-04-01037-
GAF(Ex)

METRO LIGHTS, L.L.C., a New
York limited liability company,
            *Plaintiff-Appellant,*

            v.

CITY OF LOS ANGELES, a California
municipal corporation,
            *Defendant-Appellee.*

No. 07-55207

D.C. No.
CV-04-01037-GAF

OPINION

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

Argued and Submitted
June 4, 2008—Pasadena, California

Filed January 6, 2009

Before: David R. Thompson, Diarmuid F. O'Scannlain, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge O'Scannlain

**COUNSEL**

Kenneth T. Fong, Deputy City Attorney for the City of Los Angeles, California, argued the cause for the defendant-appellant and cross-appellee and filed the briefs; Rockard Delgadillo, City Attorney, Claudia McGee Henry, Senior Assistant City Attorney, and Jeri L. Burge, Assistant City Attorney, Los Angeles, California, were on the briefs.

Laura W. Brill, Attorney for Amici Curiae CBS-Decaux LLC and California League of Cities, Irell & Manella LLP, Los Angeles, California, also argued the cause for the defendant-appellant and cross-appellee and filed briefs.

Laurence H. Tribe, Attorney, Cambridge, Massachusetts, argued the cause for the plaintiff-appellee and cross-appellant; Paul E. Fisher, Attorney, Newport Beach, California, filed the briefs; Eric V. Rowen, Scott D. Bertzyk, and Karin L. Bohmholdt, Attorneys, Greenberg Traurig LLP, Santa Monica, California, were on the briefs.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must determine whether a city violates the First Amendment by prohibiting most offsite commercial advertising while simultaneously contracting with a private party to permit sale of such advertising at city-owned transit stops.

I

This case lies at the crossroads of two courses of action that the City of Los Angeles has followed. First, in December 2001, the City entered into a contract with Viacom Decaux LLC, later to become CBS-Decaux LLC ("CBS"), under which CBS would install public facilities at city-owned transit stops across the city in exchange for exclusive advertising rights on those facilities. Five months later, the City enacted an ordinance ("the Sign Ordinance") generally banning offsite advertising[1] but excluding from its reach, among other places, such transit stops. Los Angeles Municipal Code ("L.A.M.C.") §§ 91.101.4, 91.101.5, 91.6205.11.

A

Since 1987, the City has engaged in an almost unbroken chain of agreements with private contractors in which the City granted the exclusive right to advertise on transit shelters in exchange for the installation of such facilities and annual payments. The first contract provided for the "exclusive right to display advertising materials on [transit] shelters" in exchange for the installation of 2,500 shelters, as well as annual payments of the greater of either a percentage of gross advertising receipts or a lump sum.

In May 1999, after the first contract had expired, the City entered into the Norman Bus Bench Franchise agreement, modeled after its predecessor. The City gave Norman, the franchisee, the exclusive right to place commercial advertising on bus stop benches in the City, in exchange for the installation and maintenance of 6,000 to 8,770 benches, a similar fee structure, and a commitment to place public service announcements on them.

---

[1] As discussed in greater detail *infra*, offsite advertising, or offsite signage, refers to a sign on private property advertising commercial services or wares purveyed elsewhere than on the premises where the sign is located.

The City decided to deviate from the model somewhat in late 2001. It would supersede the Norman Contract by means of a new form of agreement, which would require a franchisee to install not only new bus stop benches, but also other public facilities such as shelters at bus stops, automated self-cleaning public toilets, trash receptacles, public amenity kiosks, and news racks. Otherwise, the new contract would be identical to the Norman Contract. The City initiated an open bidding process, stating that its objectives included: (1) the use of one contractor to establish a single point of accountability; (2) the significant upgrade of "the appearance and quality of street furniture on Los Angeles City streets"; and (3) the improvement of the "visual character of the streetscape," particularly by "reduc[ing] physical and visual clutter on sidewalks" and ensuring that "[t]he streets of the City are [not] littered with various street elements that are situated in unplanned ways . . . creating general chaotic visual impacts on the street." While the new contract provided for exclusive advertising rights on the new public facilities, it said nothing about municipal regulation of offsite signs.

CBS (then known as Viacom Decaux LLC), was the successful bidder and, on December 21, 2001, entered into a twenty-year contract with the City. Under the terms of that contract, called the Street Furniture Agreement ("the SFA"), first Viacom Decaux, and then CBS, agreed to install the new public facilities and to make annual payments according to a formula similar to those the City had used in its earlier deals. The bus stop shelters and other facilities would remain City property, and the City would retain control over much of the design of the installed street furniture.

B

On April 30, 2002, the Los Angeles City Council adopted its Sign Ordinance, which listed six purposes, mostly connected to traffic safety and aesthetics.[2] Essentially, the new

_____

[2]Those purposes are: (1) ensuring "[t]hat the design, construction, installation, repair and maintenance of signs will not interfere with traffic

law, which amended L.A.M.C. § 91.6205.11, provided that "[s]igns are prohibited if they . . . [a]re off-site signs, except when off-site signs are specifically permitted pursuant to a variance, legally adopted specific plan, supplemental use district or an approved development agreement. This shall also apply to alterations or enlargements of legally existing off-site signs." The L.A.M.C. defines "Off-Site Sign" as "[a] sign which displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where such sign is located." L.A.M.C. § 91.6203. The prototypical offsite sign, it seems, is the common billboard, whether freestanding or affixed to a building or other structure. The exhibits in the record show, however, that posters set in glass cases that are then affixed to structures also count as offsite signs.

The ban applies exclusively to commercial signs. *Id.*[3] In addition, under L.A.M.C. §§ 91.101.4, 91.101.5, the City's Building Code (of which the ban is a part) does not apply to "work located primarily in a public way," such as public tran-

safety or otherwise endanger public safety;" (2) providing "reasonable protection to the visual environment while providing adequate conditions for meeting sign users['] needs;" (3) reducing "incompatibility between signs and their surroundings;" (4) providing "the public and sign users" with "signs having improved legibility, readability and visibility;" (5) "equalizing the opportunity for messages to be displayed;" and (6) providing that "adequacy of message opportunity will be available to sign users without dominating the visual appearance of the area." L.A.M.C. § 91.6201.2

[3]Metro Lights argues that "the City completely prohibits off-site signs regardless of whether they convey commercial or non-commercial speech," but our precedent forecloses such claim. *See Clear Channel Outdoor Inc. v. City of L.A.*, 340 F.3d 810, 815 (9th Cir. 2003) ("In effect, [L.A.M.C. § 91.6203] creates an exemption for noncommercial off-site signs.").

sit shelters and other facilities. The Sign Ordinance did not alter or amend this additional exemption.[4]

At the time the Sign Ordinance became effective, there were approximately 18,500 transit stops in the City.

C

Metro Lights, LLC, ("Metro Lights") owns and operates outdoor signs in a variety of markets, including Los Angeles. Around December 2003, the City issued Metro Lights numerous citations for violating the Sign Ordinance by installing new offsite signs. In response, Metro Lights brought this suit, seeking declaratory and injunctive relief, as well as damages, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 & 2202. The City moved to dismiss, while Metro Lights moved for a preliminary injunction to enjoin the City from enforcing the Sign Ordinance as to twenty specified signs. The district court granted the City's motion in part, dismissing several but not all of the First Amendment claims, but also granted Metro Lights's motion for a preliminary injunction.

Metro Lights responded by filing its second amended complaint, which also raised various First Amendment claims under § 1983. Metro Lights ultimately moved for partial summary judgment on its First Amendment claims, arguing that the SFA undermined the City's purported grounds for enacting the Sign Ordinance. After the district court had held a hearing but before it had ruled on Metro Lights's motion, the City filed its own motion for partial summary judgment on the same constitutional claims, arguing that the Sign Ordinance was constitutional in light of the City's interests in promoting aesthetics and traffic safety.

---

[4]The City earnestly argues that this is not really an exemption but simply the non-application of the statute to the public way. We fail to see any difference sufficient to change our analysis and so we do not opt for one label over the other.

On August 11, 2006, the district court entered its final order granting Metro Lights' motion for partial summary judgment on the merits of its First Amendment claim. According to the district court, "[t]he City cannot, on the one hand, preclude Plaintiff from displaying messages on its off-site signs as a supposed legitimate exercise of its police powers while, on the other hand, authorizing its Street Furniture contractor to erect off-site signs in or near the public rights of way throughout the City of Los Angeles."

After this defeat, the City filed a motion for summary judgment asserting that Metro Lights was not entitled to damages. This time the City met with some success, as the district court granted the motion and denied Metro Lights an award of damages.

Judgment was entered on January 23, 2007.[5] The City timely appealed from the grant of summary judgment as to the First Amendment claims, and Metro Lights timely cross-appealed from the grant of summary judgment denying its claim for damages.

## II

**[1]** The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." It applies to state and local governments, such as the City of Los Angeles, through the Fourteenth Amendment's Due Process Clause. *Near v. State of Minn.*, 283 U.S. 697, 707 (1931). However, "[e]ven a cursory reading" of the Supreme Court's opinions in this area of the law "reveals that at times First Amendment values must yield to other societal interests." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501 (1981). *See also Members of City Council of City of L.A. v.*

---

[5]The district court's order also granted the City's claim for summary judgment as to an equal protection claim Metro Lights made, a disposition the parties have not appealed.

*Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("It has been clear since [the Supreme] Court's earliest decisions concerning the freedom of speech that the state may sometimes curtail speech when necessary to advance a significant and legitimate state interest."). Furthermore, "[t]he Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562-63 (1980) (internal citation omitted).

**[2]** In *Central Hudson*, the Supreme Court announced a four-part test for assessing the constitutionality of a restriction on commercial speech: (1) if "the communication is neither misleading nor related to unlawful activity," then it merits First Amendment scrutiny as a threshold matter; in order for the restriction to withstand such scrutiny, (2) "[t]he State must assert a substantial interest to be achieved by restrictions on commercial speech;" (3) "the restriction must directly advance the state interest involved;" and (4) it must not be "more extensive than is necessary to serve that interest." *Id.* at 564-66; *see Clear Channel Outdoor, Inc.*, 340 F.3d at 815. No one argues that this test should not apply here;[6] since we are dealing with a regulation on commercial speech, *Central Hudson* plainly controls.

---

[6]Metro Lights briefly argues that the district court erred in applying *Central Hudson* because the regulation in this case purportedly is content-based. However, whether or not the City's regulation is content-based, the *Central Hudson* test still applies because of the reduced protection given to commercial speech. *See Ballen v. City of Redmond*, 466 F.3d 736, 743-44 (9th Cir. 2006). Metro Lights cited a number of cases in support of its argument, but none of them concerned regulation of commercial speech, and hence did not discuss the applicability of *Central Hudson*.

A

The parties do not dispute that the offsite advertising at issue in this case merits First Amendment protection because it is neither misleading nor related to unlawful activity.[7] Nor is there any serious contention that the City has not asserted a substantial interest. It is well-established that traffic safety and aesthetics constitute substantial government interests. *See Metromedia*, 453 U.S. 507-08. The L.A.M.C., indeed, stresses the City's interests in traffic safety and aesthetics several times, as did the City's proposal for bids for the SFA. *Central Hudson* requires at most that the City "assert a substantial interest," 447 U.S. at 564; such references constitute just such an assertion. Recognizing the straightforwardness of such result, the parties have focused their argument, and we therefore focus our analysis, upon the third and fourth elements of the *Central Hudson* test. That is, we ask whether the City's restriction "directly advances" the government interest and whether the City's restriction is narrowly tailored to its aim.

B

The Supreme Court has said that "[t]he last two steps of the *Central Hudson* analysis basically involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 427-28 (1993) (internal quotation marks omitted). It has not always been clear how this basic inquiry differs with respect to the last two steps of the *Central Hudson* analysis, and indeed the Supreme Court has observed

---

[7]We note that the district court's analysis confused this part of the test, though the court came to the correct conclusion as to this point. It relied in part on the observation that "[a]dvertising is undisputably a lawful activity." That is not the point, since not all advertisements receive First Amendment protection. *Central Hudson* asks if the commercial speech is "related to unlawful activity." 447 U.S. at 564. Thus, in the context of advertising, one must ask whether the goods or services the party advertises are illegal.

that the steps of the analysis are "not entirely discrete." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 183 (1999). But several important threads specific to each step bear a closer look.

1

When one asks (referring to *Central Hudson*'s third element) whether a "regulation directly advances the governmental interest asserted[,] . . . . [i]t is readily apparent that this question cannot be answered by limiting the inquiry to whether the governmental interest is directly advanced as applied to a single person or entity." *Edge Broadcasting*, 509 U.S. at 427 (internal quotation marks omitted). Thus, we must look at whether the City's ban advances its interest in its general application, not specifically with respect to Metro Lights.

[3] Another consideration in the direct advancement inquiry is "underinclusivity," which Metro Lights has made the centerpiece of its First Amendment challenge on appeal. Though it may seem counter-intuitive at first, the Supreme Court has held that a regulation can be unconstitutional if it "in effect restricts too little speech because its exemptions discriminate on the basis of the signs' messages [or because] [t]hey may diminish the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 50-51, 52 (1994). To put it in the context of the *Central Hudson* test, a regulation may have exceptions that "undermine and counteract" the interest the government claims it adopted the law to further; such a regulation cannot "directly and materially advance its aim."[8] *Rubin v. Coors*

---

[8]It is not always clear to which element of *Central Hudson* an underinclusivity analysis relates. In *Valley Broadcasting Co. v. United States*, for instance, we struck down an underinclusive regulation because it did not directly advance the government's interest, the requirement of the third element of *Central Hudson*. 107 F.3d 1328, 1333-36 (9th Cir. 1997). We have also had occasion, however, to analyze a regulation for unconstitu-

*Brewing Co.*, 514 U.S. 476, 489 (1995) (striking down a federal law prohibiting labels on beer products from showing alcohol content but permitting beer advertisements from containing such information and permitting such information on wine and spirits).

The Supreme Court has struck down several arrangements at least in part because they were unconstitutionally underinclusive. In one case, an advertising magazine sued the City of Cincinnati because it prohibited, in the interests of aesthetics and sidewalk safety, the distribution of commercial handbills in newsracks but permitted the distribution of non-commercial handbills. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424 (1993). The Court held that "the distinction [between commercial and non-commercial publications] bears no relationship *whatsoever* to the particular interests that the city has asserted." *Id.* at 424 (emphasis in original). The decision made it clear that, absent "some basis for distinguishing between [non-commercial] newspapers and commercial handbills that is relevant to an interest asserted by the city," Cincinnati could not rely on either the lower value of commercial speech for First Amendment purposes or the mere fact that by banning one kind of newsrack it was advancing its interest because, of course, there would be fewer newsracks. *Id.* at 428, 426-27 (internal quotation marks omitted). In other words, *Central Hudson* requires a logical connection between the interest a law limiting commercial speech advances and the exceptions a law makes to its own application.

---

tional underinclusivity under the narrow tailoring requirement of *Central Hudson*—the fourth element. *See Ballen*, 466 F.3d at 742-44. One might reconcile these cases by noting that in *Valley Broadcasting* the underinclusivity simply undermined the statute's ability to advance the government's interest, 107 F.3d at 1334, whereas in *Ballen* it reflected a content-based discrimination in speech, 466 F.3d at 743-44. By discriminating on the basis of content, the statute that *Ballen* struck down was "more extensive than necessary" to advance the government's interest. *Central Hudson*, 447 U.S. at 566.

In *Greater New Orleans*, a case Metro Lights cites repeatedly, the Supreme Court further clarified the meaning of unconstitutional underinclusivity. Building on prior cases, especially *Rubin*, 514 U.S. 476, the Court struck down a federal law which banned broadcast advertising for most private casinos but exempted, among others, advertising for Indian tribal casinos. 527 U.S. at 195-96. The Court found that "there was little chance that the speech restriction could have directly and materially advanced its aim"—"minimizing casino gambling and its social costs"—because its exemptions defeated its purpose. *Id.* at 193 (internal quotation marks omitted). It seems to us crucial to the Court's conclusion in *Greater New Orleans* that forbidding one type of advertising but not another "would merely channel gamblers to one casino rather than another." *Id.* at 189. Since the government had failed to convince the Court that tribal casino gambling was any less problematic than private casino gambling, such mere redistribution of gamblers was a fatal inefficacy.

**[4]** Thus, under Supreme Court precedent, regulations are unconstitutionally underinclusive when they contain exceptions that bar one source of a given harm while specifically exempting another in at least two situations. First, if the exception "ensures that the [regulation] will fail to achieve [its] end," it does not "materially advance its aim." *Rubin*, 514 U.S. at 489. This is the lesson of *Greater New Orleans*: self-defeating speech restrictions will violate the First Amendment. *See Greater New Orleans*, 527 U.S. at 190 ("The operation of [the regulation] . . . is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it."). Second, exceptions that make distinctions among different kinds of speech must relate to the interest the government seeks to advance. *Discovery Network*, 507 U.S. at 418-19 (also noting the "minimal impact" the regulation would achieve as a result of the exception).

2

As to narrow tailoring, the fourth element of the *Central Hudson* test requires that the challenged regulation not be

"more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 566. The Supreme Court has clarified that this requirement does not demand that the government use the least restrictive means to further its ends. Rather,

> what [precedent] require[s] is a fit between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.

*Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (internal quotation marks and citation omitted).

### III

As we now turn to the application of *Central Hudson* to the case before us, we are faced with a difficult threshold question. For the City argues that a more recent Supreme Court decision, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, controls the result. In *Metromedia*, the Supreme Court, applying *Central Hudson*, upheld a law similar to the City's insofar as it regulated commercial speech.

### A

Much like the Sign Ordinance in this case, the City of San Diego law at issue in *Metromedia* banned commercial offsite signs, but not onsite signs.[9] Specifically, San Diego prohibited

---

[9]The law also banned noncommercial signage, but the Court distinguished the commercial and noncommercial applications of the law for purposes of its analysis. *See Metromedia*, 453 U.S. at 506-07. A majority of the Court upheld the constitutionality of the ban to the extent that it

"[a]ny sign which advertises or otherwise directs attention to a product, service or activity . . . produced or offered elsewhere than on the premises where such sign is located." 453 U.S. at 493 n.1. In addition to leaving onsite signs untouched, the ordinance created twelve exemptions for certain offsite signs, including "government signs" and "signs located at public bus stops." *Id*. at 494, 495 n.3.

The *Metromedia* Court began by limiting its holding to billboard advertising. *Id*. at 501 ("Each method of communicating ideas is a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method. We deal here with the law of billboards." (internal quotation marks and footnote omitted)). Because we too, deal with a law regulating billboards, at least in significant part, *Metromedia* applies to this case as an initial matter, whether or not it dictates the final result.

The Court then applied *Central Hudson*. *Id.* at 507. San Diego, much like Los Angeles does now, argued that the ban furthered its interests in enhancing "traffic safety and the appearance of the city." *Id*. Just as we do in this case, the Court quickly concluded that the advertising in question was not illegal or misleading and that the City's proffered interests were substantial. *Id.* Indeed, the Court also dismissed the fourth *Central Hudson* element (narrow tailoring), summarily holding that San Diego's ordinance was no broader than necessary. *Id.* at 508 ("If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit

only prohibited commercial advertising, but a plurality ultimately overturned the ordinance because its reach included "signs carrying noncommercial advertising," such that the "ordinance reaches too far into the realm of protected speech." *Id*. at 512-521. As noted, we have held that the Los Angeles Sign Ordinance only prohibits commercial offsite signs. *See Clear Channel Outdoor Inc.*, 340 F.3d at 815.

them."). We shall return to narrow tailoring in more detail below.

"The more serious question," the Court thought, "concerns the third of the *Central Hudson* criteria: Does the ordinance 'directly advance' governmental interests in traffic safety and in the appearance of the city?" *Id.* In other words, was the ordinance underinclusive? The Court first recognized "the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety," *id.* at 509, and that "billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.' " *Id.* at 510.

Most importantly, the Court rejected the argument that San Diego "denigrates its interest in traffic safety and beauty and defeats its own case by permitting onsite advertising and other specified signs." *Id.* at 510-11. The Court based its rejection of this underinclusivity argument on three grounds. First, the law's non-application to onsite advertising, the Court noted, did not alter the direct relation between the city's goals and the ban's application to most offsite advertising. *Id.* at 511. In other words, a ban on some offsite signs still advances traffic safety and aesthetics more than a ban on none.[10] Second, the Court accepted the reasonableness of the supposition that "offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising." *Id.* Finally, the Court observed, "San Diego has obviously chosen to value one kind of commercial speech—onsite advertising—more than another kind of commercial speech— offsite advertising." *Id.* at 512. In a statement of deference most relevant to this case, the Court insisted that "[t]he ordinance reflects a decision by the city that the former interest,

---

[10]As indicated by the discussion *supra*, at 47-48, this reason, standing alone, does not appear sufficient to overcome a First Amendment challenge. *Discovery Network*, 507 U.S. at 426-27.

but not the latter, is stronger than the city's interests in traffic safety and esthetics. The city has decided that in a limited instance . . . its interests should yield. We do not reject that judgment." *Id.*

Though the deference *Metromedia* shows may seem to be in some tension with other underinclusivity cases such as *Discovery Network* and *Greater New Orleans*, the Supreme Court has reaffirmed *Metromedia* in numerous contexts since the decision. In *Taxpayers for Vincent*, the Court approvingly reviewed *Metromedia*'s conclusion that cities have a valid interest in regulating the "visual evil" of billboards. 466 U.S. at 808 n.27. *Taxpayers* relied in part on *Metromedia*'s rejection of "the argument that a prohibition against the use of unattractive signs cannot be justified on esthetic grounds if it fails to apply to all equally unattractive signs *wherever they might be located*." *Id.* at 810 (emphasis added). The Court also recognized the continuing vitality of *Metromedia* in *City of Ladue v. Gilleo*, 512 U.S. 43, when it cited the earlier opinion as bedrock for its analysis of a law restricting signs on residential property. *Id.* at 49.

B

**[5]** The ordinance considered in *Metromedia* is virtually identical to the ordinance before us now—a total ban on off-site signs, with an exception for shelters at transit stops among other exceptions, enacted to promote traffic safety and aesthetics. Furthermore, *Metromedia* explicitly addressed an underinclusivity challenge. Nevertheless, Metro Lights argues that *Metromedia* does not control this case.

1

Metro Lights argues that we are not bound by *Metromedia* for two reasons. First, it points out that "although the upheld city ordinance [in *Metromedia*] exempted bus benches, the topic of bus benches was not substantively discussed or con-

sidered" in the decision. Second, and more importantly, Metro Lights argues that the SFA, as an exception to the application of the Sign Ordinance, violates *Central Hudson*.

a

Metro Lights focuses more on the reasoning than the holding of *Metromedia*. For Metro Lights does not dispute, as it cannot, that *Metromedia* upheld a ban on offsite commercial advertising that included an exception for bus stop benches. Metro Lights insists however, that the exception was insignificant to the Court's holding, because the bus stop bench and other exceptions that the Court considered in *Metromedia* were *de minimis*, unlike the public transit exemption that Los Angeles has carved out of its Sign Ordinance. Indeed, counsel for Metro Lights at oral argument contended that the bus bench exception in *Metromedia* only came to the Supreme Court's attention because counsel for Metromedia described it as so minimal that it could not save San Diego's law from being a total prohibition on offsite advertising.

This proffered distinction fails to convince us in light of what *Metromedia* actually says. The Court expressly mentioned the twelve exceptions to San Diego's offsite sign ban. *Metromedia*, 453 U.S. at 495 n.3 (including in the list of exceptions "[a]ny sign erected and maintained pursuant to and in discharge of any governmental function" and "[b]ench signs located at designated public transit bus stops"). *Metromedia*'s reasoning confirms that the Court was well aware of the exceptions to the law and conscious that, in approving the San Diego ordinance's commercial application, it was approving those exceptions too. Indeed, the Court held the statute unconstitutional with respect to its noncommercial application in part *because* of its exceptions. *Id.* at 512-16. Responding to Chief Justice Burger's dissent, the plurality commented that "the Chief Justice . . . misunderstands the significance of the city's extensive exceptions to its billboard prohibition." *Id.* at 520. It was, indeed, the Chief Justice, not

the plurality, who suggested "that the favored categories [were] for some reason *de minimis* in a constitutional sense." *Id.* at 519. By negative implication, the majority seems to have taken the opposite position.

It is true that this second portion of the majority's argument does not mention the bus stop bench exception by name, but focuses instead on other exceptions. *See id.* (mentioning the exceptions for onsite commercial advertising and temporary political campaign advertising). But even though it is unclear whether the bus stop bench exception was foremost in the mind of the *Metromedia* Court, that hardly justifies us in ignoring its presence in the statute which, in relevant part, the Court upheld. In any event, except for counsel's reference at oral argument, Metro Lights provides no support for its argument that "the bus shelter and other exceptions" considered in *Metromedia* were "*de minimis*," or that they were significantly different in scope than the exemption in this case. Thus we must conclude that *Metromedia* is essentially indistinguishable from this case insofar as the challenged ordinances, in their commercial applications, are concerned.

b

Metro Lights also points to the SFA to distinguish this case from *Metromedia*. Indeed, its counsel, at oral argument, conceded that *Metromedia* "probably would" control without the SFA.[11] The district court, too, concluded that the Sign Ordinance, standing alone, would satisfy the *Central Hudson* test. According to Metro Lights, however, the advertising permitted under the SFA is equally dangerous—and arguably more so—than the advertising banned under the Sign Ordinance

---

[11]Counsel also did add that *Metromedia* would only control "if [the Sign Ordinance] was a ban on all offsite commercial signs," that is, without an exception for public transit facilities. But as we explained *supra*, this caveat does not hold water because the law at issue in *Metromedia* itself contained such an exception.

and therefore the ordinance cannot "directly advance" the City's interests in traffic safety and aesthetics. Metro Lights essentially contends, in other words, that the SFA so warps the regulatory scheme of the Sign Ordinance that it makes it more like the underinclusive statute the Supreme Court struck down in *Greater New Orleans* (and similar cases) than the San Diego ordinance upheld in *Metromedia*. Although we do find the SFA a troubling companion to the Sign Ordinance, we must nonetheless conclude that it does not break the grip of *Metromedia* over this case.[12]

The Court in *Metromedia* squarely faced an underinclusivity challenge to San Diego's law and rejected it. It is true that such challenge focused on the exclusion of onsite signs rather than the exclusion of signs at public transit stops. However, the Court did note the exception for "other specified signs" at the start of its substantive discussion. More importantly, nothing in its analysis, which exudes deference for a municipality's reasonably graduated response to different aspects of a problem, binds its holding inextricably to the particular onsite-offsite distinction.

This becomes apparent once one reconsiders the three main reasons the Court gave for its decision in *Metromedia*. *See id.* at 511-512; *see also supra* at 51-52. First, just like in *Metromedia*, the specific exception in question here does not

---

[12]Incidentally, we note a weakness inherent in Metro Lights' reliance on the SFA as a distinction between this case and *Metromedia*, a distinction the City never pointed out. For *Metromedia* teaches that a municipality may constitutionally bar offsite advertising with an exception for public transit stops. It would be strange, then, if the prohibition suddenly violated the Constitution because the municipality made use of such an exception. But that is what Metro Lights urges us to hold, since the SFA grants CBS the right to sell advertising where the Sign Ordinance did not apply in the first place—transit stops. How can it be constitutional to make an exception to a law, but unconstitutional for the exception to operate in practice? Metro Lights makes its argument without facing this uncomfortable question.

weaken the direct link between the City's objectives and its general prohibition of offsite advertising. Metro Lights, as did the district court, points to a photograph that shows two offsite signs, one on a bus shelter and one on an adjacent building. They are the same size and bear the same advertisement. According to Metro Lights, this literally illustrates how the SFA undermines the City's objectives. But in fact it illustrates quite the opposite. Without the Sign Ordinance, there are two signs; with it, there would be only one. Thus the Sign Ordinance would halve the clutter on the street shown in the photograph.

Second, the *Metromedia* Court accepted that offsite advertising "present[ed] a more acute problem than does onsite advertising" simply because of the former's "periodically changing content." *Metromedia*, 453 U.S. at 511. Here, Los Angeles essentially argues that the proliferation of offsite advertising by numerous and disparate private parties creates more distracting ugliness than a single, controlled series of advertisements on city property over which the City wields contractual supervision. If periodically changing content was sufficient for San Diego to disfavor offsite signs in general, then we must accept that uncontrolled and incoherent proliferation is sufficient for Los Angeles to disfavor offsite signs away from transit stops.

**[6]** Finally, and most importantly, *Metromedia*'s third rationale, with its emphasis on deference to legislative judgment, resounds quite clearly in this case. Los Angeles, just like San Diego, "has obviously chosen to value one kind of commercial speech"—controlled offsite advertising on public transit facilities—"more than another kind of commercial speech"— uncontrolled offsite advertising spread willy-nilly about the streets. *Id.* at 512. Just as in *Metromedia*, "[t]he ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interests in traffic safety and esthetics. The city has decided that in a limited instance . . . its interests should yield." *Id.* As the district court noted,

the City has been compensated handsomely for this classically legislative decision, not only in money but in the installation of presumably more attractive public transit facilities and in a veto over the design of advertisements that appear at those facilities. The *Metromedia* Court declined to overrule such a legislative judgment, *id.*, and so do we.

To apply the *Metromedia* analysis to the Sign Ordinance before us today is also to understand why Metro Lights' attempt to cast this case in the mold of *Greater New Orleans* and other underinclusivity cases fails. There, the Court found the ban on broadcast advertising of private casinos to be completely ineffective with respect to Congress's goal. Gamblers, particularly compulsive gamblers, would simply redirect their business to Indian casinos instead of private casinos. But here the Sign Ordinance allows the City to put a firm cap on the quantum of advertising it allows, precisely because, even when combined with the SFA, the ordinance prevents any redirection or "channeling" in response to it. There is only one agreement with the City, giving one company exclusive advertising rights where the Sign Ordinance already did not apply. Private offsite advertisers cannot now flood transit stops with signs the way formerly private casino gamblers could flood tribal casinos.

Furthermore, unlike, for instance, the distinction between commercial and noncommercial newsracks in *Discovery Network*, here there is "some basis for distinguishing" offsite commercial signage concentrated and controlled at transit stops and uncontrolled, private, offsite commercial signage "that is relevant to an interest asserted by the city," *see Discovery Network*, 507 U.S. at 428. Metro Lights and the district court appear to ignore that without a ban, offsite signage generates precisely the "visual clutter" that motivated both the ordinance and the SFA. Ultimately, whether one considers the Sign Ordinance from the perspective of the City's interest in traffic safety or its interest in aesthetics, the SFA does not work at inexorable cross-purposes to it. Although the SFA

permits some advertising, a regime that combines the Sign Ordinance and the SFA still arrests the uncontrolled proliferation of signage and thereby goes a long way toward cleaning up the clutter, which the City believed to be a worthy legislative goal.

At one point in its briefs, Metro Lights suggests that *Metromedia* is inconsistent with cases like *Discovery Network* (and, by implication, *Greater New Orleans*). We take no position on whether such inconsistency is real, but we simply note that we are bound to follow the Supreme Court precedent most directly on point. *See Rodriguez de Quijas v. Shearson/ Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."). For the reasons we have explained, *Metromedia* is such a case, and it controls the outcome.

2

It remains to discuss the applicability of *Metromedia*'s analysis of the fourth element of the *Central Hudson* test, narrow tailoring. Metro Lights' argument holds even less water here because the narrow tailoring requirement guards against over-regulation rather than under-regulation, *Central Hudson*, 447 U.S. at 565. As *Metromedia* observed: "[i]f the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them." *Id.* at 508. If a complete prohibition would be sufficiently narrowly tailored, then a partial one must also be. All the same, we find several arguments that demand further consideration.

a

**[7]** First, we note that the district court concluded that the sign ordinance was not narrowly tailored to the City's interests because the City could have "impose[d] the same requirements on other private advertisers that it did on [CBS]," such as by "requir[ing] that any advertisements meet certain specifications . . . to promote the City's goals with regard to traffic safety and aesthetics." The district court failed to account for the fact that the City's plan allowed it to supervise a more concentrated supply of offsite signage, which plausibly contributes to its interest in visual coherence as a part of aesthetic quality. This plausible explanation would seem to satisfy *Metromedia*'s deferential review, even if the district court's criticism might have some appeal were we writing on a *tabula rasa*.

b

Metro Lights further argues that the Sign Ordinance, when combined with the SFA, creates a content-based regime rather than a content-neutral one. According to Metro Lights, this justifies a more measured analysis of the narrow tailoring requirement than the summary treatment of *Metromedia*. Indeed, Metro Lights urges us to follow our decision in *Ballen*, where we refused to apply *Metromedia* to a municipal law prohibiting portable signs but creating several "content-based exceptions" for various signs, including real estate signs. 466 F.3d at 743. In our view, the municipality "protected outdoor signage displayed by the powerful real estate industry from an Ordinance that unfairly restricts the First Amendment rights of, among others, the lone bagel shop owner [who is the plaintiff]." *Id.* Metro Lights urges us to interpret the SFA as a similar example of a city playing favorites with whose First Amendment rights it chooses to respect.

But the analogy to *Ballen* fails. First of all, the Sign Ordinance is not by its terms a content-based regulation, nor is its

non-application to public transit facilities a content-based exception. As counsel for Metro Lights argued, "[the contents of] signs on kiosks are defined by who the speaker is, not by the message." If this is true, then it supports the City's position. For we believe it a false comparison to argue that the City favors CBS over other speakers. CBS doesn't say anything; it only sells space to advertisers who say things. And Metro Lights has shown no evidence that the City or CBS discriminate among advertisers in the sale of advertising space. Nor is Metro Lights challenging the bidding process by which the City chose CBS as its counter-party to the SFA.

Not to be deterred, Metro Lights drew our attention to additional precedents at oral argument in support of a further variation on this allegation of unconstitutional favoritism. Upping the rhetorical ante, Metro Lights accused the City of "auction[ing] off First Amendment rights" to the highest bidder, in this case CBS. This is strong, if rather sloganeering, language, but after reviewing the case law on which Metro Lights relies, we believe it to be little more than a canard.

Metro Lights bases its argument on a passage from *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987). In *Nollan* the Supreme Court found a taking without just compensation, in violation of the Fifth Amendment, where a zoning board conditioned a building permit on the grant of an easement to the government. *See generally id.* The Court began by acknowledging that if the refusal to grant a building permit was not a taking, then "a permit condition that serves the same legitimate . . . purpose as a refusal to issue the permit should not be found to be a taking [either]." *Id.* at 836. However, "[t]he evident constitutional propriety disappears," according to the Court, "if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition." *Id.* at 837. The Court then made the analogy which counsel for Metro Lights emphasized at oral argument, namely that without such a connection:

> the situation becomes the same as if [state] law for-
> bade shouting fire in a crowded theater, but granted
> dispensations to those willing to contribute $100 to
> the state treasury. While a ban on shouting fire can
> be a core exercise of the State's police power to pro-
> tect the public safety, and can thus meet even our
> stringent standards for regulation of speech, adding
> the unrelated condition alters the purpose to one [i.e.,
> raising revenue] which, while it may be legitimate,
> is inadequate to sustain the ban. Therefore, even
> though, in a sense, requiring a $100 tax contribution
> in order to shout fire is a lesser restriction on speech
> than an outright ban, it would not pass constitutional
> muster.

*Id.* at 837.

According to Metro Lights, the Sign Ordinance, coupled with the SFA, amounts to just such an unconstitutional dispensation-with-taxation system. In reality, however, this is merely the underinclusivity argument repackaged, which we reject for the reasons explained *supra*, at 54-58. Nonetheless, we take this contention on its own terms, and we find it premised on a fundamental misreading of *Nollan*.

**[8]** What makes the tax on shouting fire in a crowded theater unconstitutional, according to the majority in *Nollan*, is that, as a matter of logical necessity, it *changes* the purpose justifying the underlying ban on shouting fire—no longer for public safety but now for raising revenue. And raising revenue by taxation, though by itself perfectly legitimate state action, does not allow a state selectively to prohibit constitutionally protected conduct. But the SFA does not have the same effect as the hypothetical dispensation-tax; it does not make the Sign Ordinance about raising revenue instead of about safety and aesthetics. It is not as if CBS, by paying the City money and building handsome street furniture, is allowed to sell offsite advertisements wherever it wants, like

the man who pays for the privilege of shouting fire in a crowded theater. Moreover, and more importantly, *even if there were no SFA* but only the Sign Ordinance, the City would *still* exercise proprietary control over who gets to advertise on its transit facilities. Indeed, the City did just that with the two contracts that preceded the SFA. Such control is not an assertion of police power which the City relinquishes at a price, like the hypothetical ban on shouting fire, but a simple attribute of the City's ownership of the transit facilities. What the SFA really does is harmonize the City's interest as a proprietor of discrete pieces of property with its police power interest, manifested in the Sign Ordinance, in goals such as traffic safety and aesthetics.

It appears to us, therefore, that the slogan Metro Lights has advanced, that "First Amendment rights are not for sale," simply misses the point. Certainly the government cannot silence one speaker but not another because the latter has paid a tax, even though it could constitutionally silence both. But that doesn't mean the City cannot silence speakers in general but permit them to bid for the right to speak on City-owned land, assuming that the speakers on City-owned land do not undermine the goal of the City's general prohibition. As we have explained, the City has not done that in this case because the SFA does not "ensure[ ] that the [Sign Ordinance] will fail to achieve [its] end," or so undermine it that it cannot "materially advance its aim." *Rubin*, 514 U.S. at 489.[13]

---

[13]We are aware of other variants of the charge that the City has shown illegal favoritism. Metro Lights has implied several times that the City's overall scheme makes the City a monopolist in the supply of commercial advertising space. Even the district court found the SFA suspect because of its proximity in time to the enactment of the Sign Ordinance and its broad scope relative to the City's previous advertising agreements. But the First Amendment does not prohibit municipal monopolies. As long as the City can show with plausibility sufficient to merit the deference of *Metromedia* that the Sign Ordinance, even coupled with the SFA, advances the City's interests and is narrowly tailored, then the City's policy survives First Amendment scrutiny.

IV

**[9]** Having considered the four elements of the *Central Hudson* test in light of *Metromedia*, we conclude that the SFA does not render the Sign Ordinance unconstitutional under the First Amendment. Indeed, we believe that *Metromedia* compels such conclusion. Though Metro Lights cross-appealed the district court's grant of summary judgment for the City on the issue of damages, such issue is now moot because the City is entitled to summary judgment in its favor on the merits.

V

**[10]** For the foregoing reasons, we reverse the district court's grant of summary judgment for Metro Lights and its denial of summary judgment for the City with respect to Metro Lights' First Amendment claims and remand with instructions to dismiss. We dismiss as moot Metro Lights' cross-appeal of the district court's grant of summary judgment for the City with respect to damages.[14]

REVERSED.

---

[14]We also dismiss as moot the various requests that the Court take judicial notice.