Filed 3/10/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LAMAR CENTRAL OUTDOOR, LLC, | B260074 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS142238) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Luis Lavin, Judge. Reversed and remanded with directions.

Michael N. Feuer, City Attorney, Terry Kaufmann Macias, Assistant City Attorney, Kenneth T. Fong and Michael J. Bostrom, Deputy City Attorneys, for Defendant and Appellant.

Best Best & Krieger, Todd R. Leishman; Greene Espel and John M. Baker for American Planning Association and International Municipal Lawyers Association as Amici Curiae for Defendant and Appellant.

Law Offices of Jeffrey L. Aran and Jeffrey L. Aran for California Sign Association and International Sign Association as Amici Curiae for Defendant and Appellant.

Meyers, Nave, Riback, Silver & Wilson, Deborah J. Fox and Margaret Rosequist for League of California Cities, California State Association of Counties, and American Planning Association California Chapter as Amici Curiae for Defendant and Appellant.

Michael F. Wright for Plaintiff and Respondent.

_____

## SUMMARY

This is another round in the continuing litigation between outdoor advertising companies and the City of Los Angeles over "offsite signs" – billboards with commercial messages in locations other than at a property owner's business. In 2002, the city established a permanent ban, with some exceptions, on new offsite signs, including a ban on alterations of legally existing offsite signs (the sign ban). In 2009, the city explicitly banned offsite signs with digital displays.

In this lawsuit, filed in March 2013, plaintiff Lamar Central Outdoor LLC challenged the city's denial of 45 applications to convert existing offsite signs to digital signs. Plaintiff contended the sign ban violates the free speech clause of the California Constitution (article I or the free speech clause). Plaintiff argued the distinctions between commercial and noncommercial signs, and between onsite and offsite signs, are content-based and subject to strict scrutiny under United States Supreme Court precedents construing the First Amendment, and that California's free speech clause provides more protection than the First Amendment. Plaintiff also contended that the ban's "pervasive exceptions" caused the ban to fail even under an intermediate scrutiny test.

The trial court agreed with plaintiff, but we do not. Many authorities have upheld the constitutionality of this sign ban and other comparable laws. At its core, plaintiff's argument is that these authorities do not control decisions under the California Constitution, and that they pre-date recent high court precedents – *Reed v. Town of Gilbert* (2015) __ U.S. __ [135 S.Ct. 2218] (*Reed*) and *Sorrell v. IMS Health Inc.* (2011) 564 U.S. 552, __ [131 S.Ct. 2653] (*Sorrell*) – that require a different conclusion. We disagree with plaintiff's analysis, and find no constitutional infirmity in the sign ban. We therefore reverse the judgment.

2

## FACTS AND LEGAL BACKGROUND

### 1. The Sign Ban

The sign ban in the Los Angeles Municipal Code (LAMC or municipal code) prohibits signs if they "[a]re off-site signs, including off-site digital displays, except when off-site signs are specifically permitted pursuant to a relocation agreement . . . . This prohibition shall also apply to alterations, enlargements or conversions to digital displays of legally existing off-site signs, except for alterations that conform to . . . this Code." (LAMC, § 14.4.4.B.11.)

The municipal code defines an offsite sign as a sign "that displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where the sign is located." (LAMC, § 14.4.2.) An onsite sign is "[a] sign that is other than an off-site sign." (*Ibid.*) The city does not prohibit "an ideological, political or other noncommercial message on a sign otherwise permitted by" its sign regulations. (LAMC, § 14.4.4.A.)

The sign ban contains exceptions. It does not apply "to off-site signs, including off-site digital displays, that are specifically permitted pursuant to a legally adopted specific plan, supplemental use district or an approved development agreement." (LAMC, § 14.4.4.B.11.) In addition, under the city's building code, the sign ban does not apply to "work located primarily in a public way" (LAMC, § 91.101.4), such as public transit shelters and other facilities.

The objectives of the city's sign regulations include that "the design, construction, installation, repair and maintenance of signs will not interfere with traffic safety or otherwise endanger public safety," and that the regulations "will provide reasonable protection to the visual environment by controlling the size, height, spacing and location of signs." (LAMC, § 14.4.1.A. & B.)

3

## 2.     The Legal Background

Among the many lawsuits generated by the city's sign ban and related ordinances were three challenges in federal court, in differing contexts, to the constitutionality of the sign ban.  In each case, the Ninth Circuit found no constitutional violation.  (See *Metro Lights, L.L.C. v. City of Los Angeles* (9th Cir. 2009) 551 F.3d 898, 900, 902, 914 (*Metro Lights*) [the city did not violate the First Amendment "by prohibiting most offsite commercial advertising while simultaneously contracting with a private party to permit sale of such advertising at city-owned transit stops" (of which there were approximately 18,500)]; *World Wide Rush, LLC v. City of Los Angeles* (9th Cir. 2010) 606 F.3d 676, 679, 686-687, 690 [the city's ban on freeway facing billboards was not an unconstitutionally underinclusive restriction on commercial speech; the exceptions to the ban for billboards at Staples Center and in a special use district did not undermine the city's traffic safety and aesthetics objectives; bans on supergraphic and offsite signs were not unconstitutional prior restraints on speech]; *Vanguard Outdoor, LLC v. City of Los Angeles* (9th Cir. 2011) 648 F.3d 737, 745, 746-748 (*Vanguard*) [concluding the city's distinction between offsite and onsite signs "has been repeatedly upheld as content-neutral and valid," and rejecting the plaintiff's contention that the protections for commercial speech under the California Constitution are different from the protections under the First Amendment].)

The Ninth Circuit cases relied on high court jurisprudence, particularly *Central Hudson Gas & Electric Corp. v. Public Services Commission* (1980) 447 U.S. 557 (*Central Hudson*) and *Metromedia, Inc. v. City of San Diego* (1981) 453 U.S. 490 (*Metromedia II*).

In *Central Hudson*, the high court reiterated its previously recognized " ' "commonsense" distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.' " (*Central Hudson, supra,* 447 U.S. at p. 562; *id.* at pp. 562-563 ["The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."].)  The court summarized a "four-step analysis

4

for commercial speech" as follows: "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." (*Id.* at p. 566; see also *Board of Trustees v. Fox* (1989) 492 U.S. 469, 471, 480 (*Fox*) [restrictions on commercial speech may "go beyond the least restrictive means to achieve the desired end"; high court's decisions require "a fit [between the legislature's ends and the means chosen to accomplish those ends] that is not necessarily perfect, but reasonable"].)

In *Metromedia II*, the high court considered the constitutionality of a San Diego ordinance that banned offsite signs, with 12 exemptions (including "government signs" and "signs located at public bus stops"), but allowed onsite commercial signs. (*Metromedia II, supra*, 453 U.S. at p. 494.) (The ordinance had been upheld by our Supreme Court in *Metromedia, Inc. v. City of San Diego* (1980) 26 Cal.3d 848 (*Metromedia I*) against First Amendment and article I challenges.) In a four-justice plurality opinion, the court considered separately the effect of the ordinance on commercial and noncommercial speech, observing that its cases "consistently distinguished between the constitutional protection afforded commercial as opposed to noncommercial speech . . . ." (*Metromedia II*, at pp. 504-505.) The court concluded that, "insofar as it regulates commercial speech the San Diego ordinance meets the constitutional requirements of *Central Hudson, supra*[, 447 U.S. 557]." (*Id.* at p. 512; see *id.* at p. 511 [agreeing with "all of the cases sustaining the distinction between offsite and onsite commercial advertising"]; *id.* at p. 512 ["offsite commercial billboards may be prohibited while onsite commercial billboards are permitted"].) Justice Stevens, dissenting in part, expressly agreed with this portion of the plurality opinion: "I agree with the conclusion that the constitutionality of this prohibition is not undercut by the distinction San Diego has drawn between onsite and offsite commercial signs, . . . and I

5

therefore join Parts I through IV of Justice White's opinion." (*Id.* at p. 541, dis. opn. in part of Stevens, J.) Two other dissenting justices would have upheld the San Diego ordinance in its entirety.[1]

### 3. Plaintiff's Lawsuit

Undeterred by the sign ban and these federal precedents, in March and April 2013, plaintiff submitted 45 applications to convert some of its offsite signs to digital signs. The city denied all the applications.

Plaintiff filed a petition for writ of mandate and complaint for declaratory and injunctive relief. Its first amended petition alleged five causes of action, three of them based on the free speech clause, and the others based on the equal protection and due process provisions, of the California Constitution. As plaintiff tells us, all five causes of action "were based on two defects in the [sign] Ban: it is content- and speaker-based and it is subject to exceptions that have a significant, adverse effect on safety and aesthetics."

In October 2013, after taking discovery, plaintiff filed a motion for issuance of a writ of mandate ordering the city to issue the 45 permits. Its motion included four declarations and accompanying exhibits evidencing several exceptions to the sign ban. The exceptions plaintiff cited were these:

First, a 2006 settlement between the city and two outdoor advertising companies (CBS Outdoor and Clear Channel Outdoor) allowed the two companies to convert up to 840 signs to digital signs despite the ban. (The superior court voided this settlement in 2009, a decision affirmed by this court in 2012. (See *Summit Media LLC v. City of Los*

---

[1]  The high court found the ordinance unconstitutional on its face because of its treatment of noncommercial signs. While excepting onsite commercial signs from the ban, the ordinance had no similar exception for noncommercial messages, and in addition contained exceptions for some kinds of noncommercial signs but not others. Consequently, the ordinance "reaches too far into the realm of protected speech . . . ." (*Metromedia II, supra,* 453 U.S. at p. 521.) The court returned the case to the California Supreme Court, noting the court "may sustain the ordinance by limiting its reach to commercial speech, assuming the ordinance is susceptible to this treatment." (*Id.* at p. 521, fn. 26.)

*Angeles* (2012) 211 Cal.App.4th 921.) We also ordered the superior court to invalidate all the digital permits issued by the city under the settlement agreement (*id.* at pp. 941-942), and the trial court did so in April 2013. Plaintiff's evidence showed there were about 100 permits invalidated, for signs with a total area of over 54,000 square feet.)

Second, a 2001 agreement (the "street furniture exception") gave one outdoor advertising company the exclusive right to place advertising panels at city transit stops. (This is the agreement that was the subject of the unsuccessful challenge to the sign ban in *Metro Lights, supra,* 551 F.3d at p. 900.) Plaintiff's evidence showed the city owned 1,697 shelters and 6,161 benches, with a total of 166,366 square feet of space available for the display of signage.

Third, plaintiff showed that the city allows street banners, by permit, to advertise community, charitable, and nonprofit events, using the city's light poles. (LAMC, § 62.132(a)&(b).) The banners may include the name and logo of a for-profit sponsoring entity, limited to 20 percent of the area of the banner. (LAMC, § 62.132(r).) The rules and regulations governing street banners state that permits are only to be issued for events "which serve a civic and public interest . . . ." Plaintiff calculated the total square footage of the 7,875 street banners on display in the city on July 22, 2013, as 189,000 square feet (using the maximum size of 24 square feet).

Fourth, the city's 364 buses are available for signage under a contract between the city and Titan Outdoor LLC. A Titan inventory report showing sales in 2012 indicated that 17,246 square feet of sign space had been made available by the city.

Finally, plaintiff produced evidence that, between December 2000 (when the city first banned offsite signs on an interim basis) and 2009, the city issued permits for 151 "other" offsite signs, only four of which were located in special use districts. Plaintiff defined these "other" offsite signs as "non-digital CBS and Clear Channel ('other') offsite signs . . . ," and calculated the area of the 147 signs at 85,309 square feet. (The trial court noted that the city "submitted no evidence explaining why these signs were allowed to be erected or converted.")

7

## 4.    The Trial Court's Ruling

The trial court found the sign ban violated the free speech clause of the California Constitution, and granted the writ of mandate. The court concluded the sign ban was a content-based regulation that could not withstand strict scrutiny analysis. The court was "neither required nor inclined to follow the Ninth Circuit's decisions," and disagreed with the *Vanguard* case (which found the analysis under article I was the same as the analysis under the First Amendment). The trial court found "no persuasive authority establishing that distinctions between onsite and offsite signs and commercial and noncommercial subjects are not content-based under article I."

Acknowledging the authorities that recognize the onsite-offsite distinction as content neutral under the First Amendment, the trial court was "not inclined to extend this characterization to article I." And the sign ban could not withstand strict scrutiny, under which "a content-based speech restriction must be 'necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end.' " (*Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 869; see *Williams-Yulee v. The Florida Bar* (2015) __ U.S. __ [135 S.Ct. 1656, 1665-1666] [" 'it is the rare case' in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest"].) There was no showing, the trial court observed, "how off-site signs create special traffic- and esthetics-related problems that are not also created by on-site and noncommercial signs."

The trial court also found that, even if the *Central Hudson* test were used, the sign ban could not survive the third and fourth prongs of its intermediate scrutiny test. First, the city "failed to demonstrate that the Ban directly advances the city's asserted interests" in traffic safety and protecting the visual environment. This was because the city "failed to present any evidence" that the exceptions described in plaintiff's evidence "have not contributed to the City's traffic hazards and visual blight." The sign ban also failed the fourth prong of the *Central Hudson* test, the court said, because it is "more extensive than necessary to serve the City's interests." The court observed that an offsite sign displaying any commercial content would be subject to the ban "even if some of the

8

displayed messages are noncommercial in nature," so the sign ban "stifles otherwise protected speech in the guise of promoting traffic safety and visual esthetics."

Judgment was entered prohibiting the city from enforcing the sign ban, and ordering the city to process plaintiff's pending permit applications without regard to the sign ban.

The city filed a timely appeal. We granted applications by several parties – American Planning Association and International Municipal Lawyers Association; California Sign Association and International Sign Association; and League of California Cities, California State Association of Counties, and American Planning Association California Chapter – to file amicus curiae briefs in support of the city.

## DISCUSSION

We begin with several preliminary points.

First, after the city filed its reply brief, plaintiff filed a motion "to strike or ignore improper factual arguments raised" at pages 30 to 42 of the city's reply brief. Specifically, plaintiff contends that the city, "disguis[ing] this tactic as ordinary responses" to plaintiff's arguments, "is really . . . *challenging the trial court's findings and the evidence in the record for the first time*" in its reply brief, when plaintiff "has no opportunity to respond."

We decline to strike any part of the city's brief, but we will not consider arguments raised for the first time in a reply brief. Here, for the most part, the city's argument is proper. The city merely argues that, contrary to the trial court's conclusions, the exceptions to the sign ban do not render it underinclusive. This is an argument about ultimate conclusions of law, not disputed factual findings. The only arguably inappropriate factual discussion in the city's reply brief – arguably inappropriate because it did not appear in the city's opening brief – concerns the terms of the city's now-voided settlement agreement with CBS and Clear Channel, and the 147 "other signs" that were permitted between 2001 and 2009. The city tries to explain, from the record, why most of the permits for those 147 signs were legitimate, in the face of the trial court's statement that the city "has submitted no evidence explaining why these signs were

9

allowed to be erected or converted." We will not consider this factual argument, and note that, in the end, these 147 signs are not a significant factor in our analysis of the constitutionality of the sign ban under the free speech clause. (See discussion at p. 25, *post*.)

Second, along with its opening brief, the city requested judicial notice of several items: (1) the municipal codes of nine other California cities (to demonstrate that treating offsite commercial signs differently from onsite commercial and noncommercial signs is a wide-spread practice in California); (2) a provision of the city's municipal code that "constitutes the City's policy for creating sign districts where offsite commercial messages may be displayed"; (3) the free speech provisions of the constitutions of Florida, Indiana and Texas (states whose provisions are similar to California's and whose courts have allowed distinctions between onsite and offsite signs); and (4) the fact that the land area of the city is 468.67 square miles as indicated by the 2010 census ("to provide context to the trial court's finding that the City has permitted 460,000 square feet of offsite signs since adopting its ban in 2001").

Plaintiff does not object to the second and third items, and so we grant the request. Plaintiff opposes judicial notice of the municipal code provisions of other cities, asserting this is "new evidence." We deny the request for judicial notice of the municipal codes of other cities as unnecessary. One cannot read the case law in this area without understanding that municipal and statewide distinctions between onsite and offsite signs are common. (See *Metromedia I, supra,* 26 Cal.3d at p. 869 ["[t]he San Diego ordinance is not unique; over 100 cities and towns in California and the entire States of Hawaii, Maine, and Vermont have banned off-site billboards"].) The ubiquity of a distinction, of course, does not make it constitutional.

Plaintiff also objects to the census data showing the size of the city, contending it is "too late, and simply unfair, for the City to sneak such new evidence in on appeal." Plaintiff also argues the total area of the city is irrelevant, and the only relevant comparison is "the number of exempt signs vs. the amount of 'available sign space,' " as to which the city offered no evidence. We grant the request to take judicial notice of the

10

census data showing the total area of the city. Even without the specific data, it would be pointless to pretend we do not know that the City of Los Angeles is a very large metropolis indeed. We do not consider this "sneak[ing] new evidence in on appeal."

Third, as the city observes, when we review the validity of a law based on undisputed facts, our review is de novo.

And so we turn to the substantive issues before us.

**1.      The Governing Principles**

We have already described the legal authorities that, to date, have uniformly concluded that distinctions between commercial and noncommercial speech, and distinctions between onsite and offsite billboards, do not offend established First Amendment principles. Plaintiff, however, contends that we should not follow *Metromedia II*, that both the California Supreme Court and recent decisions of the high court "have rejected its rationale," and that in any event the commercial-noncommercial and onsite-offsite distinctions violate California's free speech clause.

Before addressing plaintiff's specific arguments, we describe the high court cases on which plaintiff's theory principally relies.

In *Reed*, the high court invalidated a town's sign ordinance banning outdoor signs without a permit, but exempting 23 categories of signs from that requirement. (*Reed, supra,* 135 S.Ct. at p. 2224.) The sign code subjected three exempted categories of *noncommercial* signs – temporary directional signs, political signs, and ideological signs – to different restrictions. The court, observing that a law is "content based" if it applies to particular speech "because of the topic discussed or the idea or message expressed," concluded the ordinance was "content based on its face," and therefore subject to strict scrutiny, because the restrictions "depend[ed] entirely on the communicative content of the sign." (*Id.* at p. 2227.)

*Reed* concluded the town could not demonstrate that the differing restrictions on the three categories of signs furthered a compelling governmental interest and was narrowly tailored to achieve that end. (*Reed, supra,* 135 S.Ct. at p. 2231.) The court assumed for purposes of argument that aesthetics and traffic safety were compelling

11

interests, and found the code's distinctions failed as "hopelessly underinclusive." (*Ibid.*) (The sign code placed strict limits on temporary directional signs while allowing unlimited numbers of other types of signs that created the same problems.)

In *Reed*, the entire court agreed that the sign code could not stand.[2] Notably, three of the six justices in the majority "add[ed] a few words of further explanation," and listed "some rules that would *not* be content-based . . . ." (*Reed, supra,* 135 S.Ct. at p. 2233, conc. opn. of Alito, J., italics added.) These included "[r]ules distinguishing between on-premises and off-premises signs," and "[r]ules that distinguish between the placement of signs on private and public property." (*Ibid.* [subjecting content-based distinctions to strict scrutiny "does not mean . . . that municipalities are powerless to enact and enforce reasonable sign regulations"].)

The second high court case undermining *Metromedia II*, plaintiff tells us, is *Sorrell, supra,* 131 S.Ct. 2653. In *Sorrell*, the high court invalidated a Vermont law regulating commercial speech, concluding the law was subject to "heightened judicial scrutiny." (*Id.* at p. 2659.) The law restricted "the sale, disclosure, and use of pharmacy records that reveal the prescribing practices of individual doctors," and provided that, with certain exceptions, the information could not be "sold, disclosed by pharmacies for marketing purposes, or used for marketing by pharmaceutical manufacturers." (*Ibid.*) The court found the statute "must be subjected to heightened judicial scrutiny," and "cannot satisfy that standard." (*Ibid.*) This was because the statute "disfavors marketing, that is, speech with a particular content," and "disfavors specific speakers, namely pharmaceutical manufacturers." (*Id.* at p. 2663; see *ibid.* ["The law on its face burdens disfavored speech by disfavored speakers."]; *id.* at pp. 2663-2664 [the law "imposes

---

**2**      The three justices who concurred only in the judgment said the distinctions between directional signs and others did not pass strict scrutiny, "or intermediate scrutiny, or even the laugh test." (*Reed, supra,* 135 S.Ct. at p. 2239, conc. opn. of Kagan, J.) The concurring justices objected to a rule that would apply strict scrutiny "to every sign ordinance in every town across this country containing a subject-matter exemption," seeing "no reason why such an easy case calls for us to cast a constitutional pall on reasonable regulations quite unlike the law before us . . . ." (*Ibid.*)

12

burdens that are based on the content of speech and that are aimed at a particular viewpoint"].)

## 2. Application of *Reed* and *Sorrell*

Neither *Reed* nor *Sorrell* supports the notion that sign ordinances may no longer distinguish between commercial and noncommercial speech, or between onsite and offsite signs. We note several points about *Sorrell* and *Reed*.

First, *Sorrell* stands for the proposition that, when commercial speech is regulated *based on its content*, the regulation is subject to "heightened scrutiny." (*Sorrell, supra,* 131 S.Ct. at pp. 2665, 2667 [Vermont's law "does not simply have an effect on speech, but *is directed at certain content and is aimed at particular speakers*," and "that circumstance is sufficient to justify application of heightened scrutiny"], italics added.)

Here, the city's sign ordinance is not directed at the content of any commercial sign, or at any particular speaker – unlike the case in *Sorrell*, where the regulation was directed at a certain content (pharmacy records disclosing doctors' prescribing practices) and was aimed at particular speakers (pharmaceutical companies). The broad categories of "commercial" and "noncommercial" are plainly not what *Sorrell* means by "speech with a particular content . . . ." (*Sorrell, supra,* 131 S.Ct. at p. 2663.)

Second, *Sorrell* did not even purport to overrule *Central Hudson*'s distinction between commercial and noncommercial speech. (*Central Hudson, supra,* 447 U.S. at p. 562.) Indeed, in the end, *Sorrell* applied *Central Hudson*. While holding that "heightened scrutiny" was appropriate because of the content- and speaker-based nature of the commercial regulation, *Sorrell* did not describe the contours of "heightened scrutiny." Instead, addressing the state's argument that its law burdened only commercial speech, the court stated that "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." (*Sorrell, supra,* 131 S.Ct. at p. 2667; *id.* at pp. 2667-2668 ["To sustain the targeted, content-based burden [the Vermont statute] imposes on protected expression, the State must show at least that the statute directly advances a substantial governmental interest and that the measure is

13

drawn to achieve that interest," citing, inter alia, *Central Hudson*].)  The statute did not directly advance either of the state's asserted interests.[3]

In short, while *Sorrell* clearly tells us that "heightened scrutiny" is appropriate for commercial regulations that are content- and speaker-based, it does *not* tell us that ordinances may not distinguish between commercial and noncommercial speech.[4]  Nor, of course, did *Sorrell* have anything to do with billboard regulation, making no mention

---

[3]      *Sorrell* concluded neither of the state's two justifications (protection of medical privacy, and policy goals of improved public health and reduced healthcare costs) "withstands scrutiny." (*Sorrell, supra,* 131 S.Ct. at p. 2668.)  For example, the law permitted "extensive use of prescriber-identifying information and so [did] not advance the State's asserted interest in physician confidentiality," and the law did not advance the state's policy goals directly, but rather "through the indirect means of restraining certain speech by certain speakers . . . ." (*Id.* at pp. 2669, 2670.)

[4]      Plaintiff also cites *City of Cincinnati v. Discovery Network, Inc.* (1993) 507 U.S. 410 (*Discovery Network*) for the proposition that restrictions distinguishing between commercial and noncommercial content are subject to "heightened scrutiny" under the First Amendment.  That is not the case.  In *Discovery Network*, the high court invalidated a "sweeping ban on the use of newsracks that distribute 'commercial handbills,' but not 'newspapers,' " observing that "whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack," and "[t]hus, by any commonsense understanding of the term, the ban in this case is 'content based.' " (*Discovery Network,* at p. 429.)  The high court found the categorical ban on newsracks dispensing commercial handbills had only a minimal impact on the overall number of newsracks (removing 62 commercial newsracks, while 1,500 to 2,000 newsracks dispensing newspapers remained in place). (*Id.* at p. 418.)  This ban "place[d] too much importance on the distinction between commercial and noncommercial speech" in a case where "the distinction bears no relationship *whatsoever* to the particular interests that the city has asserted," and was "therefore an impermissible means of responding to the city's admittedly legitimate interests." (*Id.* at p. 424.)  The court concluded the ban on commercial newsracks "cannot withstand scrutiny under *Central Hudson* and *Fox*," so the court had no need to decide whether the city's policy should be subjected to more exacting review. (*Id.* at p. 416, fn. 11.)  The court also distinguished *Metromedia II*, noting that "[u]nlike this case, which involves discrimination between commercial and noncommercial speech, the 'offsite-onsite' distinction involved disparate treatment of two types of commercial speech," and neither of the bases for that disparate treatment "has any application to the disparate treatment of newsracks in this case." (*Discovery Network,* at p. 425, fn. 20.)

14

of *Metromedia II* or its approval of the distinction between commercial and noncommercial speech, and between onsite and offsite commercial signs. This should come as no surprise, given that "[e]ach method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers of each method." (*Metromedia II, supra,* 453 U.S. at p. 501; see *ibid.* ["We deal here with the law of billboards."].)[5]

Third, *Reed* is of no help to plaintiff either. Like *Sorrell*, it does not purport to eliminate the distinction between commercial and noncommercial speech. It does not involve commercial speech, and does not even mention *Central Hudson*. *Reed* required strict scrutiny of a sign ordinance that was "content-based on its face," treating various kinds of noncommercial signs differently depending on their subject matter. (*Reed, supra,* 135 S.Ct. at p. 2228.) *Reed* did not cite *Metromedia II* either, so *Reed* certainly did not overrule or disapprove that precedent. Indeed, as we have seen, three of the justices joining the court's opinion in *Reed* expressed the view that onsite-offsite distinctions and distinctions between placement of signs on private and public property are *not* content-based and do *not* require strict scrutiny.

On this state of the law, we necessarily reject plaintiff's contention that "[u]nder *Reed*, the Ban is content-based and subject to strict scrutiny."

---

**5** After briefing, plaintiff directed our attention to *Retail Digital Network, LLC v. Appelsmith* (9th Cir. 2016) 810 F.3d 638, noting the case relates to plaintiff's argument that the commercial-noncommercial distinction is content-based. The case changes nothing in our analysis. It has nothing to do with billboards. It holds that a 1986 Ninth Circuit decision was "clearly irreconcilable" with *Sorrell*, which now "requires heightened judicial scrutiny of content-based restrictions on non-misleading commercial speech regarding lawful products . . . ." (*Retail Digital Network,* at p. 642.) The 1986 case applied intermediate scrutiny and upheld a statute forbidding manufacturers and wholesalers of alcoholic beverages from giving anything of value to retailers for advertising their alcoholic products. (*Id.* at pp. 641-642.) The court remanded the case to the district court to apply heightened judicial scrutiny in the first instance. (*Id.* at p. 651.) The result is not surprising, because it was undisputed that the law was "a content- and speaker-based restriction on commercial speech." (*Id.* at p. 650.) There is no such content- or speaker-based restriction in this case.

15

Notably, but not surprisingly, several district court cases decided after *Reed* have found *Reed* does not apply to billboard bans.  (*Citizens for Free Speech, LLC v. County of Alameda* (N.D.Cal. 2015) 114 F.Supp.3d 952, 968-969 [rejecting claim that ban on signs used for the display of offsite commercial messages was content-based under *Reed*; the plaintiffs identified no restrictions "on different categories of permitted signs . . . based on those signs' content," so *Reed* "does not apply here"; ban examined under intermediate scrutiny described in *Central Hudson*]; *Contest Promotions, LLC v. City & County of San Francisco* (N.D.Cal. July 28, 2015, No. 15-cv-00093-SI) 2015 U.S.Dist. Lexis 98520, at pp. **2, 8, 11 [distinction between onsite and offsite signage "survive[d] intermediate scrutiny as a ban on off-site commercial speech"; "*Reed* does not concern commercial speech, and therefore does not disturb the framework which holds that commercial speech is subject only to intermediate scrutiny as defined by the *Central Hudson* test"; the distinction "is fundamentally concerned with the location of the sign relative to the location of the product which it advertises" and therefore does not single out specific subject matter or specific speakers for disfavored treatment]; cf. *California Outdoor Equity Partners v. City of Corona* (C.D.Cal. July 9, 2015, No. CV 15-03172 MMM (AGRx)) 2015 U.S.Dist. Lexis 89454, at pp. *26-27 ["*Reed* does not concern commercial speech, let alone bans on off-site billboards"; "*Reed* does not even *cite Central Hudson*, let alone apply it"; *Metromedia* [*II*] and its progeny remain good law"].)

**3.    *Metromedia III* and California's Free Speech Clause**

The second branch of plaintiff's argument for the application of strict scrutiny to the sign ban asserts that the California Supreme Court "held the commercial-noncommercial distinction content-based" in *Metromedia, Inc. v. City of San Diego* (1982) 32 Cal.3d 180, 182-183 (*Metromedia III*) (it did not), and that even if strict scrutiny is not required under the First Amendment, the onsite-offsite distinction *is* content-based under California's free speech clause.  Neither of these assertions has merit.

### a. *Metromedia III*

As we have mentioned (see fn. 1, *ante*), the high court in *Metromedia II* remanded the case involving the San Diego ordinance to our Supreme Court, noting the court "may sustain the ordinance by limiting its reach to commercial speech, assuming the ordinance is susceptible to this treatment." (*Metromedia II, supra,* 453 U.S. at p. 521, fn. 26.) Our Supreme Court then held the ordinance was *not* susceptible to that treatment, concluding that a construction limiting its scope to prohibit only commercial signs "would be inconsistent with the language of the ordinance and the original intent of the city council at the time of enacting the ordinance." (*Metromedia III, supra,* 32 Cal.3d at pp. 182-183; *id.* at p. 191 ["We therefore reject the proposed construction or severance and hold [the ordinance] facially invalid."].) Construing the ordinance to avoid any prohibition on noncommercial signs, the court said, "would . . . constitute a judicial amendment of the ordinance to conform it to constitutional doctrine unanticipated by its drafters." (*Id.* at p. 187.)

Plaintiff relies on two observations the court made in *Metromedia III*. One was that the city council's intent was to eliminate signs that distracted pedestrians and motorists and blighted the aesthetic character of the city, and that "the commercial or noncommercial character of the billboard's message is largely irrelevant to these goals." (*Metromedia III, supra,* 32 Cal.3d at p. 187.) The other was that after severance, the truncated ordinance "would require the city to police the content of advertising messages, and would compel it to distinguish commercial from noncommercial speech – an extremely difficult task, and one which presents serious constitutional problems." (*Id.* at p. 190.)

From these two statements, plaintiff asserts that *Metromedia III* "stands for three propositions":  that the commercial-noncommercial distinction is content-based, triggering strict scrutiny; that the commercial-noncommercial distinction is "largely irrelevant" to safety and aesthetics, so that the sign ban cannot withstand either strict scrutiny or intermediate scrutiny; and that *Metromedia III* rejected *Metromedia II*'s

17

distinction between commercial and noncommercial speech. *Metromedia III* did nothing of the sort.

Both of the quoted observations in *Metromedia III* occurred in the context of determining whether the San Diego ordinance was severable. Neither observation came close to constituting a holding that commercial-noncommercial or onsite-offsite distinctions are "content-based" or subject to strict scrutiny. The court had no occasion to, and did not, express an opinion on either point, and as we know, cases are not authority for propositions they have not considered. Nor does the court's mention of potential "serious constitutional problems" in distinguishing commercial from noncommercial speech constitute a holding that there is no such distinction. The court's later cases clearly indicate otherwise.

We recognize, of course, that the terms "commercial" and "noncommercial" necessarily refer, in the broadest sense, to the "content" of a sign. But plainly the term "content-based," in free speech jurisprudence to date, ordinarily does not refer to whether speech is commercial or noncommercial. The term "content-based" refers, as *Reed* tells us, to the "topic discussed or the idea or message expressed" or to "specific subject matter" (*Reed, supra,* 135 S.Ct. at pp. 2227, 2230), or as *Sorrell* tells us, to "particular content," or "certain content" or "a particular viewpoint" (*Sorrell, supra,* 131 S.Ct. at pp. 2663, 2665, 2664). There is nothing in *Metromedia III* to suggest that the distinction between commercial and noncommercial speech is "content-based" for purposes of requiring courts to apply strict scrutiny to a billboard ordinance distinguishing between the two.

The noteworthy point is that five justices in *Metromedia II* agreed that San Diego could distinguish between onsite and offsite commercial signs, and two dissenting justices would have upheld the San Diego ordinance in its entirety (as our Supreme Court had also done). (See *Discovery Network, supra,* 507 U.S. at p. 425, fn. 20 ["seven Justices . . . were of the view that San Diego could completely ban offsite commercial billboards for reasons unrelated to the content of those billboards"].) Under these circumstances, to suggest that *Metromedia III* rejected the distinction between

18

commercial and noncommercial speech, or in any way held the distinction "content-based," is plainly mistaken.

### b.      The California free speech clause

Plaintiff nevertheless insists that the onsite-offsite distinction is content-based under California's free speech clause, emphasizing that article I gives every person the right to freely speak "on all subjects."[6]  For this proposition, plaintiff cites authority from the Supreme Court of Oregon, so holding under the Oregon Constitution (art. I, § 8), which prohibits laws restricting the right to speak freely "on any subject whatever." (*Outdoor Media Dimensions, Inc. v. Department of Transportation* (2006) 340 Ore. 275, 299 (*Outdoor Media*) [statute's "on-premises/off-premises distinction . . . is, on its face, an impermissible restriction on the content of speech" under the Oregon Constitution].)

While the trial court found the Oregon decision both "instructive" and "persuasive," we do not.  The Oregon court relied solely on its own state court precedents construing the Oregon Constitution, neither citing nor discussing any of the many federal authorities construing the First Amendment and finding the onsite-offsite distinction is not content-based.  (*Outdoor Media, supra,* 340 Ore. at p. 298 ["they offer little guidance in interpreting the Oregon Constitution"].)  That is not so in California.

Our own Supreme Court, in *Metromedia I* – the 1980 decision reversed by the high court because of the ordinance's application to noncommercial speech – found the San Diego ordinance "[did] not abridge freedom of speech under the California Constitution."  (*Metromedia I, supra,* 26 Cal.3d at p. 867.)  Explaining this conclusion, the court discussed and relied on decisions from other jurisdictions, including federal courts and the high court (*id.* at pp. 868-871), and concluded:  "A multitude of published decisions support the proposition that such an ordinance does not abridge freedom of speech.  Finding that the recent commercial speech cases of the United States Supreme

---

**6**      Article I, section 2, subdivision (a) states that every person "may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law may not restrain or abridge liberty of speech or press."

19

Court do not undermine those decisions, and that billboards, as permanent intrusive uses of land, may reasonably be distinguished from other media, we conclude that the San Diego ordinance does not on its face abridge freedom of speech under either the United States or California Constitutions" (*id.* at p. 871).

Plaintiff dismisses *Metromedia I*, telling us it is "not good law" and "has no precedential weight" because of the high court's reversal. That is true, of course, to the extent *Metromedia I* approved the San Diego ordinance in its application to noncommercial speech. But we see no basis for finding *Metromedia I*'s rationale under article I, in its application to commercial signs, has been "repudiated." Only another California Supreme Court or high court decision could do so, and none does.

Unlike the Oregon Supreme Court, decisions of the California Supreme Court give "respectful consideration" to First Amendment precedents when analyzing claims under article I. (*Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 341 ["Our case law interpreting California's free speech clause has given respectful consideration to First Amendment case law for its persuasive value, while making clear that 'federal decisions interpreting the First Amendment are not controlling.' [Citation.]"].)

Further, plaintiff is mistaken when it asserts that article I "does not recognize the U.S. Supreme Court's 'commercial speech/noncommercial speech dichotomy.' " Many cases in other free speech contexts show otherwise. For example, in *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 946, the court considered the question whether a corporation's false statements were commercial or noncommercial speech "for purposes of constitutional free speech analysis under the state and federal Constitutions." The court continued: "Resolution of this issue is important *because commercial speech receives a lesser degree of constitutional protection* than many other forms of expression, and because governments may entirely prohibit commercial speech that is false or misleading." (*Ibid.,* italics added.) Moreover, the court pointed out that in some circumstances, it has "used the same analysis for both [federal and state free speech] constitutional provisions." (*Id.* at p. 959.) And, after concluding the speech in question

20

(the defendant corporation's public statements defending labor practices and working conditions) was commercial speech under the First Amendment (*id.* at pp. 968-969), the court "perceive[d] no need to articulate a separate test for commercial speech under the state Constitution" (*id.* at p. 969).

Our colleagues in the Fourth District have recently rejected a claim that a city's ban on all new offsite commercial billboards violated California's free speech clause, affirming a preliminary injunction requiring the defendants to cease using and remove a billboard erected without a permit. (*City of Corona v. AMG Outdoor Advertising, Inc.* (2016) 244 Cal.App.4th 291, 304, 306 ["*Metromedia* [*II*] remains the law of the land"; under *Metromedia II*, a governing entity may allow or discriminate in favor of onsite commercial signs and ban or discriminate against offsite commercial signs; the result is the same under the California Constitution].)

In sum, we now have California precedent finding an onsite-offsite distinction does not violate article I, and in any event we would not follow Oregon precedent that gives no consideration to federal authorities that our own Supreme Court instructs us to consider for their persuasive value. We note in addition that other states have free speech clauses similar to ours, and courts in those states have upheld ordinances against both state and federal constitutional challenges to an onsite-offsite distinction. (See, e.g., *Texas Dept. of Transportation v. Barber* (Tex. 2003) 111 S.W.3d 86, 106 [Texas free speech clause " 'may be more protective of speech in some instances than the First Amendment, . . . but if it is, it must be because of the text, history, and purpose of the provision, not just simply *because*.' "]; *U.S. Outdoor Advertising Co., Inc. v. Indiana Dept. of Transportation* (Ind.Ct.App. 1999) 714 N.E.2d 1244, 1262, fn. 20, 1264 [statute "does not draw distinctions among commercial signs based on their *content*, but only on their *location*, which is constitutionally permissible," applying *Central Hudson* test and *Metromedia II*].) Accordingly, we reject plaintiff's contention that California's free speech clause requires strict scrutiny of the city's sign ban.

### 4.    Intermediate Scrutiny of the Sign Ban

Plaintiff argues, and the trial court concluded, that the sign ban in any event fails intermediate scrutiny under the *Central Hudson* test.  Again we disagree.

The trial court's principal rationale for finding the sign ban "does not directly advance the City's interests" was, in essence, that it was underinclusive:  that is, there were too many exceptions to the ban that *also* contribute to traffic hazards and visual blight.  Thus the trial court observed that the city "has permitted approximately 460,000 square feet worth of off-site signs to be erected since 2001," and the city failed to demonstrate that those 15,000 offsite signs, "in addition to the on-site, noncommercial, and exempted off-site signs that are posted throughout Los Angeles, have not contributed to the City's traffic hazards and visual blight."

*Metromedia II*, and the Ninth Circuit cases that have repeatedly found the city's sign ban constitutional, reject the notion that the sign ban does not directly advance the city's interests, and so do we.  And while we recognize that these cases are not controlling under California's free speech clause, they are persuasive.  Thus, as *Metromedia II* observed, "whether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics."  (*Metromedia II, supra,* 453 U.S. at p. 511; *id.* at p. 512 [conclusion than the offsite sign ban directly advanced San Diego's stated objectives "is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising"].)

The same is true of the other exceptions the trial court and plaintiff cite.

As *Metro Lights* explains, "a regulation may have exceptions that 'undermine and counteract' the interest the government claims it adopted the law to further; such a regulation cannot 'directly and materially advance its aim.' " (*Metro Lights, supra,* 551 F.3d at p. 905; *id.* at p. 906 [an ordinance is unconstitutionally underinclusive if the exceptions " 'ensure[] that the [regulation] will fail to achieve [its] end' "]; see *Greater New Orleans Broadcasting Assn. v. United States* (1999) 527 U.S. 173, 190, 193 [an ordinance may be "so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it"].)  But this is not such a case.

22

A regulation is not underinclusive simply because it has exceptions. Here, more than 40 percent of the 460,000 square feet of excepted offsite signs (half of the 15,000 signs) cited by the trial court consist of street banners advertising community, charitable, and nonprofit events (7,875 banners, at 189,000 square feet). Another 36 percent of the square footage consists of street furniture signs at city transit stops (7,858 signs, or 166,366 square feet).

As *Metro Lights* explains, the street furniture exception "does not weaken the direct link between the City's objectives and its general prohibition of offsite advertising." (*Metro Lights, supra,* 551 F.3d at p. 910.) *Metro Lights* concluded that, with or without the street furniture exception, the sign ban would decrease visual clutter, and that "uncontrolled and incoherent proliferation [of offsite advertising by numerous and disparate private parties] is sufficient for Los Angeles to disfavor offsite signs away from transit stops." (*Ibid.*) *Metromedia II*'s "emphasis on deference to legislative judgment[] resounds quite clearly in this case," the court said, valuing one kind of commercial speech ("controlled offsite advertising on public transit facilities") more than another ("uncontrolled offsite advertising spread willy-nilly about the streets"). (*Metro Lights,* at p. 910.) *Metro Lights* "declined to overrule such a legislative judgment," concluding: "Ultimately, whether one considers the Sign Ordinance from the perspective of the City's interest in traffic safety or its interest in aesthetics, the [street furniture exception] does not work at inexorable cross-purposes to it. Although the [street furniture exception] permits some advertising, a regime that combines the Sign Ordinance and the [street furniture exception] still arrests the uncontrolled proliferation of signage . . . ." (*Id.* at p. 911.)

We are presented with no reason to disagree with the *Metro Lights* analysis, and the same principles necessarily apply to the city's exceptions for street banners advertising community, charitable and nonprofit events, as well as the advertising on the city's 364 buses. (The city tells us that it does not regulate signs displayed on vehicles and confined to the vehicle's surface area, private or public.) There is no basis to

conclude that any of these exceptions "work[s] at inexorable cross-purposes" (*Metro Lights, supra,* 551 F.3d at p. 911) to the sign ban.

That leaves, as unexplained exceptions to the sign ban, the 147 offsite billboards belonging to other outdoor advertising companies that received some type of permit since the initiation of the sign ban in 2001. These unexplained billboards amount to about 85,000 square feet of signage in the entire City of Los Angeles. We cannot invalidate the sign ban based on these 147 permitted exceptions, improper or not. If any of them were improperly permitted, other remedies exist to correct the impropriety. If they were properly permitted, for whatever legal reason, we cannot conclude the 147 permitted exceptions " 'ensure[] that the [sign ban] will fail to achieve [its] end,' " or that the sign ban "does not 'materially advance its aim.' " (*Metro Lights, supra,* 551 F.3d at p. 906, quoting *Rubin v. Coors Brewing Co.* (1995) 514 U.S. 476, 489.) On the contrary, the sign ban "still arrests the uncontrolled proliferation of signage and thereby goes a long way toward cleaning up the clutter, which the City believed to be a worthy legislative goal." (*Metro Lights,* at p. 911.)

Plaintiff insists the sign ban is underinclusive under *City of Fresno v. Press Communications, Inc.* (1994) 31 Cal.App.4th 32, telling us that *City of Fresno* "is an Article I underinclusiveness case" with "precedential weight here." *City of Fresno* is an article I case, but it has no application here. The court there invalidated an ordinance that restricted the distribution of advertisements, campaign materials, and unauthorized newspapers, while excepting from the restriction religious publications, charitable publications and "a myriad of other types of publications which may be delivered to a home or business." (31 Cal.App.4th at p. 40.) The court concluded that the ordinance was "on its face a content-based restriction upon the distribution of protected speech and as such violates the First Amendment." (*Id.* at p. 43.) As we have already discussed at some length, the sign ban here is *not* a content-based restriction. The only notable point is that *City of Fresno* did not distinguish between the First Amendment and California free speech clause analysis.

24

Finally, plaintiff contends the sign ban is more extensive than necessary to serve the city's interests, violating the fourth prong of the *Central Hudson* test.  Plaintiff cites the trial court's statement that plaintiff's permit applications "would be denied under the Ban's onsite-offsite distinction even if it wanted to display offsite commercial messages only 1% of the time," so that "the Ban stifles otherwise protected speech [i.e., noncommercial speech] in the guise of promoting traffic safety and visual esthetics."  We reject that rationale as entirely speculative and unsupported by pertinent legal authority.  Under the sign ban, a noncommercial sign is allowed wherever a commercial sign is allowed.  The high court has plainly held that what is required is not the "least restrictive means," but rather a reasonable fit between the legislature's ends and the means chosen to accomplish those ends.  (*Fox, supra,* 492 U.S. at pp. 471, 480.)  That exists here.

In sum, the city's offsite sign ban is not content-based, and therefore is not subject to strict scrutiny or heightened scrutiny under high court or California Supreme Court precedent.  Consistent with the many authorities finding no constitutional infirmity under the First Amendment in the distinction between offsite and onsite signs, we reach a like conclusion under the free speech clause of the California Constitution.

### DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions to issue an order denying plaintiff's petition for a writ of mandate.  The City shall recover its costs on appeal.

GRIMES, J.

WE CONCUR:


BIGELOW, P. J.



FLIER, J.


25